Good morning. May it please the Court, my name is Stacey Tolchin and I, with Megan Brewer, represent Petitioner Matevosyan. I would like to reserve five minutes of my time for rebuttal. Petitioner challenges two orders before the Court. He challenges the June 2018 Order of Reinstatement of Removal issued by DHS and the September 2018 Denial of Reasonable Fear by the Immigration Judge. As the Court is aware, the petition for review in this case was filed more than 30 days after the Order of Reinstatement, but both orders are properly before the Court under Ortiz-Alfaro. If the Court believes that Ortiz-Alfaro is no longer good law after intervening Supreme Court precedent, then Petitioner requests supplemental briefing post-argument on the issue of jurisdiction. But here the government does concede that jurisdiction is proper. First, I wanted to address the Immigration Judge's reasonable fear decision, unless the Court would prefer I address the reinstatement order. The challenge to the reasonable fear decision is controlled by Alvarado-Herrera. Alvarado-Herrera establishes that the purpose of a reasonable fear interview is to screen claims for withholding of removal and CAC. It's a screener for frivolous claims. But Alvarado establishes that if the person is credible, then he need only establish a 10% likelihood of persecution or torture to then merit a future withholding of removal claim where he gets a full due process hearing before an Immigration Judge. As in Alvarado-Herrera, Petitioner was found to be credible. He clearly meets that 10% threshold for purposes of withholding and CAC. He was a whistleblower in Armenia who witnessed corruption by an army general. He reported that the general was diverting canned foods that were donated to the army and he was diverting that to his personal zoo animals. The petitioner reported the corruption to journalists and then to the new prime minister and eventually then the army general was arrested and charged and convicted of corruption. Petitioner was attacked by armed men who shot at his car and then called him and told him that they knew he was responsible for what happened to the general and that they would kill him. Under Alvarado-Herrera, this is sufficient to meet that reasonable fear threshold standard. No reasonable adjudicator could conclude that the 10% standard was not met because this was a case about a personal vendetta. Petitioner reported corruption and the misappropriation of food for personal enrichment. He testified that he was shot at after the general was arrested. He testified that he believed these people were members of the Armenian Republican Party before the asylum office. This unquestionably shows persecution on account of political opinion. The board's decision in matter of NM from 2011 sets forth that any whistleblower case establishes a political opinion nexus unless retaliation is untethered to a governmental system. Under the matter of NM test, petitioner showed that he engaged in activities that could be considered anti-corruption, that there was direct evidence that the persecutors were motivated by these efforts and that there's evidence of corruption in Armenia. He clearly met that threshold showing for purposes of withholding under Alvarado-Herrera. He also met it for purposes of cat. That's a little overstated. As I read the record, and please correct me if I'm wrong, the conclusion was that this was essentially a personal vendetta that played out as a consequence of a dispute, if you will, between your client and the general. Why did the idea's conclusion that that did not amount to political persecution? Why wasn't that supported by substantial evidence? I don't think that's true. In other words, why would any adjudicator, any reasonable adjudicator be compelled to conclude differently? I think that NM, the board decision, really is on point on this. This wasn't an issue where it was a minor issue about personal rights being violated. That's what the Singh case was in the Ninth Circuit that the government relies on. This was a case where he was doing work at the army general's property, noticed that all these materials were being diverted. This was material that was given and donated for the army that didn't have food. Then he contacted journalists. After he contacted journalists and the prime minister, the army general gets convicted of corruption. Just the conviction of corruption alone supports that this was political. This is the head of the army. This isn't a low-level person and a, you know, you punched me, so it's a personal vendetta thing. He saw something that was systemically a problem, taking this food for himself and then giving it to his personal zoo. So this is the quintessential political opinion case, I think. But the general here, I mean, the corruption that was trying to be uncovered was what he was doing with his zoo, right, diverting resources for his own animals, is that correct?  So I'm just trying to—I'm struggling a bit because even if the IJ had applied the factors in matter of NM, I'm still trying to figure out how would Metsvin overcome the third factor if his actions were merely against one general and not directed toward a governing institution, especially on these facts. So there's a couple points here. The first is to, of course, recognize that this is a screening procedure, right? This is just a threshold screening. Is this a frivolous claim? This is not a frivolous claim at all. What's really necessary is a full withholding of removal hearing where he has a right to present evidence, testify, and have a full due process hearing. In addition, as the court knows, his counsel was not allowed to elicit testimony, right? The immigration judge said to counsel, you cannot question him at all, that's my job. You can only summarize the case and submit evidence. And so here, because of this issue accompanying the case of a deprivation of the right to counsel, that also confuses what the record is, right? And so it again shows that a full due process withholding hearing was required. Well, but if I understand the record, tell me here, this is your opportunity. It looks like Metsvin did have counsel present at the hearing before the IJ, correct? He did. All right. And the counsel was able to submit evidence, correct? Make a closing statement? Correct. And answer questions related to Metsvin's political opinion claim? Well, the counsel could not question her claims. Yeah, I understand that. But he could answer questions related to the claim, right? Correct. So all of that was allowed and present. So I'm just struggling with how—I understand the point you're making, but that's one point here, and I'm not sure that's enough to compel a different outcome on how— I mean, I'm just trying to figure out how Metsvin was deprived of counsel. If he did have counsel present and that counsel was allowed to do everything I just set forth. I would like to direct you to Orozco-Lopez, which was issued last year, and it says that there is a statutory right to counsel in the reasonable fear proceeding and states specifically that counsel's role is largely to help her client testify convincingly about her fear so that the IJ will find it reasonable. And that was prevented here. And, of course, the right to counsel cases say that there's no showing of prejudice required. So just by preventing counsel from questioning— Did counsel ever ask to be permitted to question, and was that ever denied? Yes, Your Honor. Page 7 of the record, counsel specifically asked and was told by the judge, no, only I get to ask questions. You get to summarize and present evidence. That's it. If I may ask a question. IJs are typically fact finders, but in reasonable fear determinations, we said in Alvarado-Herrera that they actually sit in an appellate capacity, and, in fact, they don't even have to hear new evidence. The IJ doesn't have to hear new evidence in assessing the reasonable fear determination. So given that, I mean, the limitations the IJ put on the attorney, I mean, I'm not sure how your argument you can overlook Alvarado-Herrera's, you know, strong language saying IJs only have appellate capacity. They don't even have to hear evidence. It seems like your client had access to counsel in this appellate capacity here. I think the answer is Orozco-Lopez. It exactly addresses that point. Is Orozco-Lopez—I do want to ask your opposing counsel about that. On the other hand, is that—it seems more like dicta, though, there. I mean, it wasn't really central to the reasoning of it. Well, I don't think anything about the right to counsel is dicta. It's a statutory right to counsel. If there's a right to counsel, what is the role of an attorney, right? So you don't—I mean, if there's an attorney present who's asking to question the client and there was a finding previously that there was no reasonable fear, of course it's relevant and important that the attorney be there to elicit questions, to meet that standard for reasonable fear. Otherwise, it's futile. I mean, there's no reason to have counsel there. Yes, but in Orozco-Lopez, really the holding there was your right to counsel and the reasonable fear determination is limited to being told that you have a right to it, and there's a 10-day limit, and if you don't get counsel, it's too bad. So, I mean, I don't know if that language there was—it seems more like dicta. But, again, I do want to ask your opposing counsel about that. Right. I just want to point out, if there's a right to counsel, the counsel has to be able to represent their client, obviously. Otherwise, it's meaningless. I have five minutes left. Would you like to hear about the reinstatement order? No. It's your time. Okay. So, obviously, we have a whole other challenge to the reinstatement order. The petitioner was a permanent resident when he was deported. There's a 2004 order finding that he was deportable for an aggravated felony. The law at the time under Hirsch, which is still good law here, establishes that it was not a crime involving moral turpitude, that a 1001 conviction is not moral turpitude. There was no law explicitly on the aggravated felony ground, but the standard for moral turpitude is for something that's fraud or deceit, and that's the same standard for 1101A43M, which is the aggravated felony ground. And so Hirsch was the controlling law at the time, and given that, he— How can a 1001 conviction not involve deceit? So, Hirsch was controlling. It does say that. It says—there's also, by the way, a bond, which is pre-Hirsch, says that 1001 does not include an intent to deceive. Now, there's a circuit split. The second circuit just— No, it doesn't say intent. By definition, you can't get convicted of 1001 without the government proving deceit. So I'm not—so there's a circuit split on the intent to deceive issue, right? I'm assuming that if there's deceit, there has to be an intent to deceive, and the Ninth Circuit says there's no intent to deceive. The 6th, 7th, and I believe the 7th— How do you commit deceit without an intent to commit deceit? So I think— The FBI comes in and they ask you whether you read a beating, you signed this document, you did so-and-so, and you said no when they knew you did, and you get charged with 1001. How do you know—how can you be convicted of a violation of that statute without the government satisfying the element of deceit? So the Ninth Circuit— That's what the whole statute is. There's well-established precedent in the Ninth that says that a false statement does not necessarily include deceit. It's Blanco, it's Hirsch, it's Goldstein.  Now, there is a circuit split on this issue. There's also a circuit split on whether 1001 requires an intent to deceive at all. Give me an example of someone committing deceit without intending to. So an example I could think of was where somebody's applying for a green card, they're asked when their last entry was. They don't disclose their last entry because they were having an extramarital affair and didn't want anybody to know about it. So it's still material to the resolution of the case, but it wasn't deceitful. It had nothing to do with the resolution of the case. It was just a personal issue. And so you still would be guilty if you don't want to disclose an affair to the officer. It's not—certainly not—has nothing to do with the resolution of the case. You want to benefit from the government that you otherwise weren't entitled to get, so you've got to fool the government. Well, but it's not about—it's about hiding the extramarital affair. You were entitled to it, let's say, but you just didn't—it didn't disqualify you. It's just that you didn't want to disclose it. I have a minute and a half, Your Honor. Do you mind if I reserve? Thank you. Thank you. Counsel. Good morning. May it please the Court. My name is Craig Newell, and I'm here on behalf of the Attorney General. There are four major issues in this case, and I'll first mention the first-order problem of the jurisdictional question. The government would be happy to provide some supplemental briefing if the Court does wish it to do so. But the Second Circuit's decision in Bakhtai-Patel really lays out why that intervening precedent of Nasrallah and Guzman-Chavez commands a different jurisdictional approach, that the 30-day time period runs from the reinstatement order itself. And that's because an immigration judge's negative reasonable fair determination, or for that matter, any adverse agency decision about withholding of removal or CAT, they are not final orders of removal themselves under the particular definition of final order of removal in the INA. They're not orders concluding that the alien is deportable. They don't order deportation. And withholding and CAT, they're very unique avenues of relief, unlike other avenues, because they do not affect the validity of the removal order. And so that's why in these circumstances, you know, so what is the final order of removal we have? Well, we have a prior order of removal, but that's very old. So where is the 30-day going to run from? That would run from the reinstatement order itself. And I just want to note that back in this court's Ortiz-Alfaro case, it did note that there are compelling arguments that Ortiz's reinstated order of removal was the final order of removal, but for prudential reasons, ran the 30 days from the negative reasonable fair determination. But now those reasonable, I'm sorry, those prudential reasons can't be relied on when Supreme Court precedent commands a contrary interpretation. If I'll move on next, if there's no questions on that, I can move on to the, about the issue of the right to counsel. Now, Mr. Matt DeVosteen had counsel during, throughout the proceedings before the immigration judge. And as we argued in the brief and as it's clear in the record, that counsel was allowed to provide a written brief, supply documentary evidence corroborating the general Gregorian's arrest and also country conditions report. He was not deprived of counsel. Can you, counsel, if I can interrupt, can you address and try to reconcile our decisions in Alvarado-Herrera, which said I.J. sits in an appellate capacity in a reasonable fair determination with the language in Orozco-Lopez, which says, you know, quote, counsel's role is largely to help her client testify convincingly about her fear so that the I.J. will find it reasonable. Right. So first, what Alvarado-Herrera teaches is that those, those procedures that the immigration judge sits in an appellate capacity, those are, comport with due process, that, you know, the immigration judge does not need to take any new evidence, let alone hear testimony. So the immigration judge has comported himself with the regulations and due process. And to determine the scope of one's right to counsel, what both Orozco and Alvarado show is that scope of the right to counsel is cabined by the regulation that says that this needs to be done in 10 days. So that right to counsel only can take place in that 10 days. So here we have this other regulation that says that this court has found to be permissible that the immigration judge sits in an appellate capacity. So in that capacity, you know, what is the type of representation that one is allowed? And it's certainly what Mr. Mathevosian was given. Mr. Mathevosian was given the opportunity to have this counsel there, to be there. If the counsel felt a need to object to something the immigration judge said during the hearing, I think. What does that language mean? Right. It could be if the immigration judge permits attorney-led questioning, then the attorney is there to do it. It could also just simply mean that if you have an attorney, that attorney can go over your asylum officer interview with you and make sure that you gave all the details necessary. And before the hearings, you know, advise you as to, you know, did you say everything you need to say? Oh, you didn't say this. Make sure you say that when the immigration judge asks you about it. And here, his prior counsel before the immigration judge, there's no indication that she affirmatively asked for questioning and was denied. The immigration judge just said, this is how I'm going to do this arrangement. And really the testimony was nothing more than the immigration judge just confirming the accuracy of what was in that asylum officer hearing. He was essentially just conducting the appellate review that is required under the regulations. So here, there's no deprivation of counsel. Then as to the merits of the immigration judge's decision, I think there's two points to make. Is the first that here on judicial review, Mr. Mazzavossian has to show that the record compels the, you know, the contrary conclusion that compels the conclusion that he established a reasonable possibility of persecution on account of a political opinion or of suffering torture. And while the screening process itself is a screening threshold process, I think there's been a conflation of it with the screening process for expedited removal orders with the credible fear. That's a much lower standard here. What you have to meet in the, in this screening process is essentially meet the asylum burden, which is to show a well-founded fear. The reasonable possibility equals a well-founded fear, which you need to look for a subjectively genuine fear, which there was no ruling finding him not credible. It was all about objectively reasonable. Counsel, can I interrupt you? I'm sorry to interrupt you, but you're addressing an area I wanted to ask about, because here it appears that IJ affirmed that AO's finding that the men shot and threatened petitioner were motivated by personal vendetta, right? Yes. But the question I wanted to ask you about is withholding a removal allows for mixed motives. So here, couldn't the fact that the men retaliated against the petitioner expose the general for corruption be motivated at least, I guess, in part on petitioner's anti-corruption belief, even if they may have also been, if the men may have been also motivated by personal retaliation? In a different case, not in this case, there's not compelling evidence that this is even a mixed motive case. There's no political dimension to this, to that conflict. General Gregorian abused his authority and got this food for his private zoo. It was for his own personal benefit. And then the individuals who worked for him, were his supporters, just sought vengeance against Mr. Matavosian. They don't give any kind of hint that they're like, oh, I view you as the opposition, like call them some kind of name or something like that, that would give you a hint that there's a political, that they imputed some kind of political dimension onto here. And regarding his anti-corruption claim. First, if you look at NM, some of the things to look for is,  as an anti-corruption individual, someone who fights against that. And that's not the case here. There's no outward public-facing statements that Mr. Matavosian, that the general public who may or may support the General Gregorian, may have became aware of. These seem to be insiders, people who worked. People did, according to the factual claims, people at General Gregorian's estate or ranch saw Mr. Matavosian notice all this allegedly stolen food and other items. So there's just not that political dimension that would get there. And also, while there is generalized evidence of corruption in Armenia, here, the most on-point objective evidence is the fact that the Armenian authorities went after General Gregorian. They arrested him, they jailed him, and they prosecuted him. And there's no evidence to show that they wouldn't do the same for his mere supporters and underlings if they committed a crime. And when there's particular evidence regarding the particular threat to the alien, that evidence trumps any kind of generalized evidence. And in addition, that generalized evidence is from a 2017 State Department report. And so considering things that happened in 2016, these events, the new prime minister who's still in power, happened all in 2018 after a popular uprising. So here there's just no... And that also leads to the fact that no reasonable adjudicator would compel a finding of governmental acquiescence either. And for those reasons, that order, if this court assumes jurisdiction, that order should be not disturbed. Lastly, I'll talk about the... I'm sorry. We'll talk about Mr. Mativosian's claim that his prior removal order was a gross miscarriage of justice. Now, it wasn't. The immigration judge in 2004 applied the correct interpretation of the broadly worded phrase, offense that involves fraud or deceit. This aggravated felony ground about fraud or deceit doesn't require formal elements of fraud or formal elements of deceit, doesn't require an intent of deceit. What it requires is deceitful conduct. And the Supreme Court in the later issued Kawashima case defined deceitful conduct, one example of that is a falsification. Here we have a making, a willful making of a false statement. And it's almost substantially similar to the crimes that were at issue in Kawashima. There it was willfully making a false tax return and the aiding and assisting the preparation of such a false return. And here we have aiding and abetting of making a false statement. So you have that material false statement and you have deceitful conduct. And so there's just... The immigration judge in this case didn't have the benefit of Kawashima, but he still interpreted it correctly. In such a circumstance, you can't find that to rise to the level of a gross miscarriage of justice, which means to show that it was clearly wrong at either the time of issuance or the time of removal. And so it would have withstood judicial scrutiny for sure as it correctly anticipated the correct interpretation that the Supreme Court set forth in Kawashima. If there are no further questions on any of the issues, I appreciate this court's time and thank you. Thank you, Mr. Neal. Thank you. First, I'd like to direct the court to page 1197 of Alvarado-Herrera, which talks about the purpose of the credible fear screening threshold and just says that if you make an allegation of corruption, even if no country conditions are submitted, no evidence is submitted, that's enough to meet that threshold. And that would be controlling here. And I know the court has concerns about this being a personal vendetta, but Matavossian, the petitioner, had nothing to gain personally. It wasn't like in Singh where he had been beaten up. Don't they have to be credible allegations of corruption? And he was found credible. He was found credible by both the IJ and the asylum officer, and that's exactly what happened. You're saying that you get through the door if you make allegations of corruption, right, that this particular country or regime is corrupt? That is. How can that be? I mean, you know, if you go through Europe, put aside EU countries, in many parts of the world you are very hard-pressed to find countries that are not corrupt. Well, this is, again, only a threshold screening. We're just asking for the real hearing, the withholding-only hearing. This was just the screening. So he's not asking to win. He's asking for the withholding-only hearing. Obviously there was corruption because Gregorian was convicted of corruption precisely for this act. And this goes to the political element as well. It can't be a personal vendetta claim when it wasn't petitioner's food that Gregorian was stealing. It was food donated to the army that he was stealing. And he calls journalists and he calls the prime minister because he views this as corruption, and then Gregorian is convicted of corruption. That is the quintessential political corruption case. As to jurisdiction, it is... What's your theory that happens to him as a consequence of reporting corruption? What happens to the petitioner? Yeah. Well, he's shot at by people from the Armenian Republican Party, right? And then they threaten him. I mean, he's just asking for a hearing on withholding only where he can present evidence and be questioned by his attorney and have a full hearing that's not done within one day. As to the jurisdiction issue, obviously it's very complicated. We really do request supplemental briefing. Obviously, Ortiz Alfaro should be affirmed. It's also consistent with the court's cases in Padilla-Ramirez v. Bible and the Supreme Court's decision in Paris-Guzman. It makes the distinction between an administratively final order and an order that's final for purposes of judicial review. And if you look at the statutes, they're written differently. 1231A1B, which is the detention standard, uses administratively final. 1252B1 uses final order of removal. And Padilla-Ramirez v. Bible really talks about this. So all this goes to say, we think Ortiz Alfaro is still good law, but please, we do request the opportunity for supplemental briefing on that issue. Thank you. Great. Thank you, Your Honor. Thank you very much. Thank you. So, Mr. Holshen and Mr. Newell, thank you both for your presentations. Very helpful. The case of Grigor Metsovician v. Merrick Garland is submitted.
judges: MURGUIA, Parker, LEE